IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EDWARD NELLSON,** | |
| *Plaintiff,* | |
| v. | **Case No.** |
| **U.S. FEDERAL BUREAU OF PRISONS,** | |
| **GARY PETRY and THERESA STENMARK,** *in their individual capacities,* Oklahoma City Transfer Center, 7410 S MacArthur Blvd, Oklahoma City, OK 73169, | **JURY TRIAL DEMANDED** |
| **WARDEN JOHN DOE OF USP BIG SANDY, NORBERT ROSARIO, MILLS, LEFEVER, KATHRYN ARRINGTON, DAVID SPRADLIN, WILLIAM BILLITER, and NORRIS,** *in their individual capacities,* USP Big Sandy, 1197 Airport Rd, Inez, KY 41224, | |
| **WARDEN JOHN DOE OF USP HAZELTON, SHU Lt. JOHN DOE AT USP HAZELTON, GREGORY MIMS, and LEIGH BIRD** , *in their individual capacities*, USP Hazelton, 1640 Sky View Dr, Bruceton Mills, WV 26525**, and** | |
| **DIANE SOMMER, PHILIP HLAVAC, and WALTERS,** , *in their individual capacities,* USP Canaan, 3057 Eric J. Williams Memorial Dr, Waymart, PA 18472, | |
| *Defendants.* | |

## COMPLAINT FOR MONETARY DAMAGES AND INJUNCTIVE RELIEF

Mr. Nellson, a federal prisoner at USP Florence, CO, hereby brings *Bivens* claims against

individuals working for the Federal Bureau of Prisons ("BOP") and seeks injunctive relief

against the BOP. Mr. Nellson suffered a spinal injury in 2016. Defendants denied Mr. Nellson

medical care, including a *wheelchair*, and repeatedly placed him in solitary confinement, without

a walker or a wheelchair, to punish him for "not walking." Defendants' actions violated Mr.

Nellson's Eighth Amendment Constitutional protections against cruel and unusual punishment.

## **INTRODUCTION**

Mr. Nellson, a prisoner, fell from his bunk in **March 2016** causing a severe and

excruciating spinal injury that went **undiagnosed and untreated for four years**. Over the next

two years, Mr. Nellson's condition worsened, leading to paralysis, seizures, and neurological

deficits, Finally, on **March 22, 2018**, over two years after he fell, Mr. Nellson received an FMRI

of his spine. The MRI showed, **for the first time**, his actual injury: significant damage to his

spine. With this newly acquired information about his actual injury, Mr. Nellson realized that

Defendants' failure to treat his various symptoms, over the span of years, caused his injury that

was diagnosed on March 2016. After March 22, 2016, Mr. Nellson discovered that this injury is

now life-threatening. Despite being in intractable pain for four years, and consistently reporting

that pain to Defendants, Mr. Nellson was only given pain medication, for the first time, in

**October 2018**.

The reason Mr. Nellson's injury was not discovered until March 22, 2018 is because

these  Defendants insisted that Mr. Nellson was malingering, and faking his injury despite Mr.

Nellson continually falling in the presence of Defendants, despite many of these Defendants

seeing Mr. Nellson on video crawling and grasping for objects to help him stand up, despite

outside physicians from reputable hospitals ordering Mr. Nellson ambulatory assistance such as a

wheel chair/walker, inter alia. Instead, these Defendants engages in sadistic conduct such as

telling Mr. Nellson to "snap out of it" and by locking him up in solitary confinement—without a

wheelchair/walker—because he couldn't walk without assistance. In fact, having been confined

in solitary confinement for months at a time, crawling on the ground to get around, Mr. Nellson

developed suppurating callouses. Defendants' actions were nothing short of torture in violation of Mr. Nellson's Eighth Amendment rights. Mr. Nellson brings this *Bivens* actions against individual Defendants and seeks injunctive relief against the Federal Bureau of Prisons ("BOP") to finally be placed in a Level 4 Care Facility which is necessary and adequate to his current classification as a Level 4 Care prisoner.

## VENUE & JURISDICTION

1.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1361 and 5 U.S.C. § 702 et seq, and Fed. R. Civ. P. 65 (injunctive relief), because this claim arises under the US Constitution and federal statutes.

2.

Venue is proper in the United States District for the District of Columbia because the Defendant US Federal Bureau of Prisons is located from, and directs its agents' actions from, this District. Further, there is no single District where all Defendants reside. Given that Defendants reside in several districts, venue is proper where *any* Defendant is subject to the court's personal jurisdiction, which is in this District. *See* 28 U.S.C. § 1391(b)(3).

## PARTIES

### I.    Plaintiff

3.

Plaintiff Edward Nellson is a prisoner at USP Florence, located in Florence, Colorado, in the care & custody of the Federal Bureau of Prisons or the BOP.

## II.     Defendants

4.

The U.S. Federal Bureau of Prisons ("BOP") is a federal agency of the United States Government, operating in the entire United States but headquartered in the District of Columbia.

### A.  BOP Oklahoma Transfer Center Defendants.

5.

Defendant RN/MXR Theresa Stenmark was the nurse at the BOP Oklahoma City Transfer Center, OK, at the time of Mr. Nellson's injuries. Ms. Stenmark committed the first of what would become continuous violations of Mr. Nellson's Eighth Amendment rights, from 2016 to the present.

6.

Defendant Dr. Gary L. Petry, MD/CD, was a BOP physician and Clinical Director at BOP Oklahoma City Transfer Center, OK, at the time of Mr. Nellson's injuries and thereafter. Often, when Mr. Nellson was transferred, he would run back into Dr. Petry, who continued to delay and deny care, making it harder for Mr. Nellson to get care at each new facility. Dr. Petry was instrumental in maintaining the continuity of the violations.

### B.  USP Big Sandy, KY, Defendants.

7.

Defendant Warden John Doe at USP Big Sandy, KY, was warden during all relevant times at USP Big Sandy and will be identified during discovery.

8.

Defendant Dr. Norbert Rosario, MD, was a BOP physician at USP Big Sandy, KY and was supposed to provide medical care to Mr. Nellson. Dr. Rosario was also Clinical Director at

USP Big Sandy. As such, not only did Defendant Rosario participate in the denial and delay of medical care to Mr. Nellson, he also oversaw and approved every other healthcare providers' actions in that respect. His actions were continuing violations of Mr. Nellson's Eighth Amendment rights.

9.

Defendant Mills was a BOP mental health provider at USP Big Sandy, KY, and was supposed to provide medical care to Mr. Nellson. Defendant Mills worked with other Defendants to deny and/or delay Mr. Nellson's medical care. Their actions were continuing violations of Mr. Nellson's Eighth Amendment rights.

10.

Defendant Lefever was a BOP mental health provider at USP Big Sandy, KY, and was supposed to provide medical care to Mr. Nellson. Defendant Lefever worked with other Defendants to deny and/or delay Mr. Nellson's medical care. Their actions were continuing violations of Mr. Nellson's Eighth Amendment rights. Plaintiff will uncover Defendant's name during discovery.

11.

Defendant PA-C William O. Billiter was a BOP healthcare provider at USP Big Sandy. Defendant Billiter participated in the denial and delay of medical care to Mr. Nellson. Their actions were continuing violations of Mr. Nellson's Eighth Amendment rights.

12.

Defendant RN David J. Spradlin was a BOP healthcare provider at USP Big Sandy. Defendant Spradlin participated in the denial and delay of medical care to Mr. Nellson. Their actions were continuing violations of Mr. Nellson's Eighth Amendment rights.

13.

Defendant RN Kathryn Marie Arrington was a BOP healthcare provider at USP Big Sandy in Kentucky during all relevant time periods. Defendant Arrington participated in the denial and delay of medical care to Mr. Nellson and participated in the decision to place Mr. Nellson in SHU. Nurse Arrington also participated in the rumor mongering regarding Mr. Nellson's alleged malingering.

14.

Defendant SHU Lt. Norris worked at and for BOP at USP Big Sandy in Kentucky during all relevant time periods. Lt. Norris participated in the denial and delay of medical care to Mr. Nellson and participated in the decision to place Mr. Nellson in SHU. Their actions were continuing violations of Mr. Nellson's Eighth Amendment rights. Mr. Nellson will obtain this Defendant's first name after discovery. Their first name is not currently available to Mr. Nellson.

**C.  USP Hazelton, WV, Defendants.**

15.

Defendant Warden John Doe at USP Hazelton was warden during all relevant times at USP Hazelton and will be identified during discovery.

16.

Clinical Director Dr. Gregory Mims at USP Hazelton was supposed to provide medical care to Mr. Nellson. Dr. Mims was also Clinical Director at USP Hazelton. As such, not only did this Dr. Mims participate in the denial and delay of medical care to Mr. Nellson, he also oversaw and approved every other healthcare providers' actions in that respect. His actions were continuing violations of Mr. Nellson's Eighth Amendment rights.

17.

SHU Lt. John Doe at USP Hazelton approved the placement of Mr. Nellson in SHU without a wheelchair or a walker, failed to report Mr. Nellson's inability to walk while in SHU, and failed to report the suppurating callouses that Mr. Nellson was experiencing. SHU Lt. John Doe knew of Mr. Nellson's condition, saw him in SHU, and yet showed deliberate indifference to his health and safety. His actions were continuing violations of Mr. Nellson's Eighth Amendment rights.

18.

Defendant PA-C Leigh Bird was a healthcare provider employed by BOP at USP Hazelton, WV, at the time of Mr. Nellson's stay there. Defendant Bird participated in the denial and delay of medical care to Mr. Nellson. Defendant Bird's actions consisted of a continued violation of Mr. Nellson's Eighth Amendment rights.

**D.  USP Canaan, PA, Defendants.**

19.

Defendant Dr. Diane Sommer, MD, was Clinical Director at USP Canaan, PA, during Mr. Nellson's stay there. Defendant Sommer participated in the denial and delay of medical care to Mr. Nellson. Her actions consisted a continued violation of Mr. Nellson's Eighth Amendment rights. Defendant Sommer, further, as Clinical Director, had supervisory and signoff authority regarding all the care Mr. Nellson did and did not receive.

20.

Defendant Dr. Philip J. Hlavac, MD, was a healthcare provider contract by BOP at USP Canaan, PA, with a specialty in neurological surgery, during all relevant time periods. Defendant

Hlavac participated in the denial and delay of medical care to Mr. Nellson. Hlavac's actions were continuing violations of Mr. Nellson's Eighth Amendment rights.

21.

Defendant PA-C Walters was a BOP healthcare provider at USP Canaan at all relevant times. PA-C Walters reviewed Mr. Nellson's medical records and purported to treat him. PA-C Walters recorded Mr. Nellson as having a pain of 7 out of 10 and failed to treat that pain. PA-C Walters kept treating Mr. Nellson as though he was malingering and lying, further denying and delaying medical care. PA-C Walters' first name will be uncovered during discovery. Walter's actions were continuing violations of Mr. Nellson's Eighth Amendment rights.

## FACTUAL ALLEGATIONS

I.   <u>Oklahoma City Transfer Center, OK</u>: Mr. Nellson sustains a serious injury to his head and spine while in the care & custody of BOP.

22.

On March 28, 2016, while a prisoner with the BOP at the Oklahoma City Transfer Center, Mr. Nellson fell out of the top bunk, where he was sleeping, falling approximately 6 feet onto his head. Ex. 1. Mr. Nellson lost consciousness for 5 to 7 minutes. *Id.* He was unable to stand when he re-gained consciousness. *Id.* at 6. He began reporting pain and dizziness immediately.

23.

Mr. Nellson injured his spine when he fell out of his bunk on March 28, 2016, but he would only receive confirmation of this injury on March 22, 2018—two years after his fall and two years during which Defendants repeatedly told Mr. Nellson he was not hurt and it was "all in his head." It is indisputable that Mr. Nellson injured his spine on March 28, 2016.

24.

It is undisputable that as a result of Mr. Nellson's fall, combined with Defendants' negligence and deliberate indifference, Mr. Nellson suffered multiple disk extrusions, cord compression, disk herniation, and a disk bulge. Ex. 2.

25.

It is undisputable that as a result of Mr. Nellson's spinal injury, he stopped being able to ambulate unassisted as of March 28, 2016, and this inability only got worse with time as a proximate and direct cause of Defendants' conduct.

26.

It is undisputable that as a result of Mr. Nellson's spinal injury, Mr. Nellson began having seizures.

27.

It is undisputable that as a result of Mr. Nellson's spinal injury, Mr. Nellson was in excruciating pain for years.

**A.  Identities of Oklahoma City Transfer Center Defendants.**

28.

Mr. Nellson brings claims against the following Oklahoma City Transfer Center Defendants: 1) Clinical Director Dr. Gary Petry; and 2) Nurse Stenmark.

29.

Dr. Petry oversaw Mr. Nellson's treatment and treated Mr. Nellson himself. Dr. Petry reviewed all of Mr. Nellson's records, not only after his injury, but for years thereafter. Consequently, Dr. Petry knew Mr. Nellson had suffered an injury, showed decreasing ability to walk unassisted, and continued to report pain. Despite this, Dr. Petry did not prescribe pain

medication to Mr. Nellson and obstructed Mr. Nellson's ability to transfer to an institution with the appropriate Care Level every time he was able to over the next four years. Dr. Petry's actions showed deliberate indifference and were negligent.

30.

Nurse Stenmark treated Mr. Nellson immediately after his fall in March 2018. Nurse Stenmark received Mr. Nellson's complaint of pain. Nurse Stenmark refused to prescribe pain medication to Mr. Nellson; consequently, Mr. Nellson was left in agonizing pain for an extended period of time.

**B. Mr. Nellson begins a long, difficult, and painful path where BOP personnel repeatedly calls him a liar and refuses to treat him.**

31.

From the Oklahoma Transfer Center, Mr. Nellson was taken to a medical unit and then sent to the Emergency Room. He was given a CT of the head and was told there was "no bleed." Mr. Nellson did not receive any additional imaging of his head **or of his spine at that time**, and thus as a result of not receiving any MRI on his spine, Mr. Nellson did not obtained a diagnosed spine injury.

32.

As an immediate result of the fall, Mr. Nellson suffered intense pain, he was dizzy, he could not walk, and he felt a tingling sensation in his body. Ex. 1; *see* Ex. 3 at 5 (reporting a pain scale of 8 out of 10). Mr. Nellson relayed his symptoms, including his severe pain, to his healthcare providers, which included Nurse Theresa Stenmark and Dr. Petry, both healthcare providers working for BOP at the Oklahoma City Transfer Center. *Id.*

33.

After relaying his symptoms of severe pains and tingling sensation in his body to Stenmark and Petry, Neither Dr. Petry nor Ms. Stenmark gave Mr. Nellson **pain medication** as a result of his visit to the medical unit on March 28, 2016. Ex. 1; Ex. 3.

34.

After relaying his symptoms of severe pains and tingling sensation in his body to Stenmark and Petry, neither Dr. Petry nor Nurse Stenmark ordered a spine MRI. *Id.* Dr. Petry, having reviewing Mr. Nellson's records, approved and condoned Nurse Stenmark's refusal to give Mr. Nellson pain medication or further investigate his injuries.

35.

Dr. Petry's acts and omissions caused pain and suffering to Mr. Nellson by failing to provide him pain relief for his injuries.

36.

Nurse Stenmark's acts and omissions caused pain and suffering to Mr. Nellson by failing to provide him pain relief for his injuries.

37.

Instead, Dr. Petry and Nurse Stenmark gave Mr. Nellson a wheelchair and placed him on a flight to Atlanta, GA, that same day, March 29, 2016.

38.

Mr. Nellson spent approximately two weeks in Atlanta, GA, during which he continued to report he was in pain, had difficulty standing, and was dizzy. While in the care & custody of the BOP in Atlanta, GA, Mr. Nellson was not provided with pain medication, muscle relaxers, or neurological medication.

**II.    BOP has four-level care system for prisoners and institutions.**

39.

BOP has four levels of classifications for prisoner care, which get applied to prisoners

and to facilities. Ex. 4. "This Federal Bureau of Prisons (BOP) Clinical Guidance for *Care Level*

*Classification for Medical and Mental Health Conditions or Disabilities* provides

recommendations for classifying inmates' medical and mental health conditions so that the

inmates can be assigned to the BOP institutions that can best meet their health care needs." Ex. 4

at 3.

40.

The stated purpose of the classification system is to match inmate healthcare needs to

institutions who can meet those needs, "The goal of this classification system is to match inmate

health care needs (particularly in terms of intensity of care issues, access to community medical

resources, and functional criteria) with institutions that can meet those needs. The intended result

is improved management of these inmates' conditions at a lower overall cost to the agency." Ex.

4 at 3.

41.

There are four levels in the BOP medical care level classification system. Each inmate

and each institution are assigned a care level. Ex. 4 at 3.

42.

 "Inmate care levels are determined by their medical and/or mental health needs and are

based primarily on the chronicity, complexity, intensity, and frequency of interventions and

services that are required, as well as an inmate's functional capability." Ex. 4 at 3.

43.

"Institution care levels are based primarily on the clinical capabilities and resources of the institution and the surrounding community, as well as specific missions, e.g. dialysis, oncology, etc." Ex. 4 at 3.

44.

Care Level 1 prisoners are less than 70 years of age and are generally healthy. Ex. 4 at 4. Prisoners who are Care Level 1 "may have limited medical needs that can be easily managed by clinician evaluations every 6–12 months." Ex. 4 at 4. According to BOP, "example conditions" are: "*Mild asthma, diet-controlled diabetes, stable HIV patients not requiring medications, well-controlled hyperlipidemia or hypertension, etc.*" *Id.* (italics in original).

45.

Care Level 2 prisoners are stable outpatients who require clinician evaluations monthly to every 6 months. Ex. 4 at 4. According to BOP, Care Level 2 prisoners are prisoners for which "medical and mental health conditions can be managed through routine, regularly scheduled appointments with clinicians for monitoring." *Id.* While Care Level 2 prisoners may need enhanced medical resources, such as consultation or evaluation by medical specialists, these would only "be required from time to time." *Id*. The BOP lists the following "example conditions" for Care Level 2 prisoners, "*Medication-controlled diabetes, epilepsy, or emphysema.*" *Id*. at 4.

46.

Care Level 3 prisoners are outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications. Ex. 4 at 5. According to BOP, Care Level 3 prisoners "may require assistance with some activities of daily living

(ADLs) that can be accomplished by inmate companions. Stabilization of medical or mental health conditions may require periodic hospitalization." *Id*. at 5. Activities of Daily Living are: eating, urinating, defecating, bathing, and dressing/undressing. *Id*. at 5. The BOP lists the following Care Level 3 "example conditions": "*Cancer in partial remission, advanced HIV disease, severe mental illness in remission on medication, severe (NYHA Class III) congestive heart failure, and end-stage liver disease.*" *Id*. (italics in original).

47.

Care Level 4 applies to prisoners who "require services only at a BOP Medical Referral Center (MRC), which provides significantly enhanced medical services and limited patient care." In order to qualify for Care Level 4, a prisoner's "[f]unctioning may be so severely impaired as to require 24-hour skilled nursing care or nursing assistance." Ex. 4 at 5. The BOP "example conditions" for Care Level 4 are, "Cancer on active treatment, dialysis, **quadriplegia, stroke or head injury, major surgical treatment**, and high-risk pregnancy." Ex. 4 at 5 (emphasis added).

48.

**It would be years before BOP would upgrade Mr. Nellson to a Care Level 3, let alone Care Level 4**. Mr. Nellson persistently asked that his Care Level be increased, first to a Care Level 3 and as his condition deteriorated, to Care Level 4. Mr. Nellson is now a Care Level **4 prisoner in a Care Level 2 facility**.

III. **Mr. Nellson is transferred to USP Big Sandy, KY, where he is subjected to inhumane conditions.**

49.

On April 13, 2016, Mr. Nellson was transferred to USP Big Sandy, KY. During in-processing Mr. Nellson disclosed his need for care, such as either a walker or a wheelchair. BOP

personnel screamed at him that "there is nothing wrong with [him]." BOP personnel did this despite Mr Nellson's clear symptoms, including his inability to walk unassisted with normalcy.

**A. Identities of the USP Big Sandy Defendants.**

50.

Mr. Nellson brings claims against: 1) John Doe Warden of USP Big Sandy, KY; 2) Dr. Rosario; 3) Dr. Lefever; 4) Dr. Mills; 5) Nurse Arrington; 6) Nurse Spradlin; 7) PA-C Billiter; and 8) SHU Lt. Norris (hereafter, collectively, "USP Big Sandy Defendants").

51.

John Doe Warden at USP Big Sandy, KY, reviewed and approved the decision to place Mr. Nellson in solitary confinement (the "SHU") as a measure to punish him for "not walking," without a wheelchair or a walker, thereby approving the infliction of excruciating pain, severe emotional distress and mental anguish, as well as further injury to his back because while in 23/1 isolation without any mechanism to assit his walking, Mr. Nellson has to crawl and rool around, casing further injury to his spine.

52.

Dr. Rosario knew the contents of Mr. Nellson's records, knew about Mr. Nellson's inability to walk, knew that Mr. Nellson was in pain, and despite that knowledge showed deliberate indifference to Mr. Nellson's health and safety. Dr. Rosario thereafter failed to prescribe pain medication, neurological medication, or anti-seizure medication. Dr. Rosario failed to seek an MRI of Mr. Nellson's spine. Dr. Rosarion **withdrew Mr. Nellson's wheelchair** and approved the placement of Mr. Nellson in solitary confinement as a punitive measure for Mr. Nellson not walking, despite his inability to do so.

53.

Nurse Arrington knew the contents of Mr. Nellson's records, knew about Mr. Nellson's inability to walk, knew that Mr. Nellson was in pain, and despite that knowledge showed deliberate indifference to Mr. Nellson's health and safety.

54.

Nurse Arrington lied about seeing a "video" of Mr. Nellson walking in his cell and used that lie to deny Mr. Nellson's medical care.

55.

Nurse Arrington also used that lie to justify placing Mr. Nellson in solitary confinement as a punishment for failing to walk, despite his organic inability to do so.

56.

Nurse Spradlin knew the contents of Mr. Nellson's medical records, knew about Mr. Nellson's pain, and despite that knowledge showed deliberate indifference to Mr. Nellson's health and safety. Nurse Spradlin's acts & omissions caused Mr. Nellson pain and suffering.

57.

PA Billiter knew the contents of Mr. Nellson's medical records, heard Mr. Nellson tell him he was in pain, and personally observed that Mr. Nellson could not stand unassisted. Despite this, PA Billiter denied Mr. Nellson was in pain. PA Billiter did not prescribe pain medication, neurological medication, or muscle relaxers. PA Billiter also did not recommend physical therapy and did not give Mr. Nellson a walker or a wheelchair. PA Billiter's deliberate indifference resulted in pain and suffering to Mr. Nellson, as well as increasing Mr. Nellson's damages.

58.

Dr. Lefever is a BOP mental health professional at USP Big Sandy, KY. Dr. Lefever reviewed Mr. Nellson's medical records and yet, insisted that Mr. Nellson's injuries did not exist. Rather, Dr. Lefever sought to coerce Mr. Nellson into accepting a mental health diagnosis of "conversion disorder," which, in other words, was the notion that Mr. Nellson's very real spinal injury was "in his head."

59.

Dr. Mills is a BOP mental health professional at USP Big Sandy, KY. Dr. Mills reviewed Mr. Nellson's medical records and yet, insisted that Mr. Nellson's injuries did not exist. Rather, Dr. Mills sought to coerce Mr. Nellson into accepting a mental health diagnosis of "conversion disorder," which, in other words, was the notion that Mr. Nellson's very real spinal injury was "in his head."

60.

SHU Lt. Norris saw the video of Mr. Nellson allegedly working out and confirmed that Mr. Nellson was moving around with limited mobility, using walls and surfaces for support, and unable to ambulate unassisted. Despite this, SHU Lt. Norris approved the placement of Mr. Nellson in 23:1 lockdown, without a wheelchair or walker. SHU Lt. Norris did not report the injuries Mr. Nellson was suffering while in SHU. Therefore, SHU Ltr. Norris evinced deliberate indifference towards Mr. Nellson. Mr. Nellson will obtain this Defendant's first name after discovery. Their first name is not currently available to Mr. Nellson.

**B.  The USP Big Sandy Defendants deny that Mr. Nellson is injured and treat him like a liar.**

61.

Nurse Arrington reported on April 15, 2016, that there was no need for Mr. Nellson to have a wheelchair and she insisted she saw him ambulating in SHU. She did this while Mr. Nellson could not ambulate unassisted and with full knowledge of Mr. Nellson's medical records to that point. She did this despite the fact that Mr. Nellson had been given a wheelchair in Oklahoma City and she was aware of this.

62.

As a result of Nurse Arrington's and Dr. Rosario's acts & omissions, while at USP Big Sandy, Mr. Nellson had no wheelchair, and although he was eventually given a wheelchair, this was done without any change in his condition from the time he entered USP Big Sandy. *See* Ex. 5 (giving wheelchair pass to Mr. Nellson **weeks after his arrival** at USP Big Sandy on April 29, 2016). Defendants knew Mr. Nellson could not ambulate unassisted. During the time Mr. Nellson did not have a wheelchair, he fell represented and crawled around, twisting his back, all acts that caused further injury to his spine.

63.

In April 2016, Nurse Arrington lied and told Mr. Nellson that he was ambulating normally in the SHU observation cell. She then spread that information to other individuals on BOP staff. Those individuals then also spread the same lies and misinformation. Their statements describing Mr. Nellson as doing "exercise" were lies and aided the deprivation of Mr. Nellson's constitutional rights.

64.

Nurse Arrington directed BOP staff to place Mr. Nellson in the yard "with no wheelchair." This meant Mr. Nellson was not only vulnerable to other inmates, but unable to get around.

65.

On April 21, 2016, SHU Lt. Norris investigated Mr. Nellson's situation and found that the videotape **did not show Mr. Nellson ambulating around**. Rather, the video showed Mr. Nellson grabbing the bunk, his wall, and his sink—and anything he could—to maneuver himself around. These actions were consistent with Mr. Nellson's limited mobility. Mr. Nellson was cleared of accusations.

66.

Mr. Nellson had been complaining of a headache since his fall, in March 2016, and he still had that headache on April 22, 2016.

67.

Defendants Arrington, and Rosario had yet to give Mr. Nellson as much as an aspirin for his pain despite him repeatedly telling them verbally and through grievances and medical request that he was in severe pain.

68.

On April 22, 2016, Nurse Spradlin saw Mr. Nellson and falsely stated he had "No" pain. Ex. 6. Mr. Nellson did, in fact, report pain. Yet, Nurse Spradlin did not give Mr. Nellson any pain medication.

69.

On April 27, 2016, Mr. Nellson saw PA Billiter, who declared that Mr. Nellson was in "No" pain despite the fact that Mr. Nellson told PA Billiter he was in pain.

70.

On April 27, 2016, PA Billiter also listed all the falsities regarding Mr. Nellson ambulating in his SHU cell, and then noted "The video has not been seen by this provider." Ex. 7. PA Billiter, therefore, relied on an investigated and debunked video, which he did not bother seeing, to deprive Mr. Nellson of care. PA Billiter did not bother to look at the video himself.

71.

Also, on April 27, 2016, PA Billiter also noted that **Mr. Nellson could not stand unassisted**, "An attempt was made to have the prisoner stand with two officers and myself bracing the prisoner, it was unsuccessful. Inmate became extremely dizzy and he stated that he feared he would fall, no Romberg was completed." Ex. 7 at 1.

72.

Despite his own observations, and the undisputable medical records in Mr. Nellson's background, PA Billiter denied further care to Mr. Nellson. PA Billiter did not prescribe pain medication, neurological medication, or muscle relaxers. PA Billiter also did not recommend physical therapy and did not give Mr. Nellson a walker or a wheelchair. PA Billiter's deliberate indifference resulted in pain and suffering to Mr. Nellson.

73.

On April 29, 2016, healthcare staff other than Defendants ordered for Mr. Nellson to receive a wheelchair. Nothing had changed in Mr. Nellson's condition. **Defendants later interfered to have that wheelchair taken from Mr. Nellson.**

74.

On May 2, 2016, Mr. Nellson reported a headache to Dr. Rosario. Ex. 8 at 7 (note that the records describe both Mr. Nellson's diagnosis of "headache" and then report pain as "0" belying the accuracy of Dr. Rosario's records). Again, Dr. Rosario gave Mr. Nellson no pain medication. *Id*.

### 75.

On May 4, 2016, Mr. Rosario reviewed an x-ray of Mr. Nellson's skull, where Mr. Nellson's history stated, "Multiple head traumas, unable to stand unassisted." Ex. 9. It is undisputable that Dr. Rosario knew Mr. Nellson could not walk unassisted; despite this and other knowledge of Mr. Nellson's condition such as "Multiple head traumas, unable to stand unassisted," on May 5, 2016, **Dr. Rosario retracted Mr. Nellson's wheelchair pass**. Ex. 10 at 1.

### 76.

Dr. Lefever and Dr. Mills were mental health professionals at BOP USP Big Sandy. Dr. Lefever and Dr. Mills reviewed Mr. Nellson's medical records, including the recorded fact that: 1) Mr. Nellson has fallen six feet and has a loss of consciousness; 2) Mr. Nellson had been found, by multiple providers, to not be able to walk unassisted; 3) Mr. Nellson had repeatedly reported pain; and 4) Mr. Nellson has intermittently been granted a wheelchair. Despite this, Dr. Lefever and Dr. Mills continued to insist that Dr. Nellson's symptoms were "in his head."

### 77.

Dr. Lefever and Dr. Mills incorrectly diagnosed Mr. Nellson with "conversion disorder."

### 78.

The diagnosis of conversion disorder eventually disappeared from Mr. Nellson's records, with no additional assessments or testing. The diagnosis was always meant to coverup USP Big Sandy Defendants' deliberate indifference and negligence.

**C. The USP Big Sandy Defendants placed Mr. Nellson in solitary confinement to punish him for his disability.**

79.

While at USP Big Sandy, Mr. Nellson was called up to the office of one of the BOP's lieutenants. While in the office, Mr. Nellson was thrown to the ground, out of his wheelchair. BOP employees told Mr. Nellson that if he did not get up and walk to the wall, he would be placed in SHU. The individuals in the room for, and participating in this horrific incident, included Nurse Arrington, and Dr. Rosario. Mr. Nellson did not walk because he could not walk. As a result, and as promised, he was punished by being placed in SHU.

80.

In May 2016, Defendants Norris, Rosario, and Arrington approved Mr. Nellson's placement in 23:1 lockdown, colloquially referred to as "the SHU Program" for 2.5 months.

81.

Defendants Norris, Rosario, and Arrington approved Mr. Nellson's placement in SHU without a wheelchair or a walker.

82.

When Defendants Norris, Rosario, and Arrington placed Mr. Nellson in the SHU without a wheelchair or a walker, they knew Mr. Nellson needed a wheelchair or a walker to ambulate because they had read and discussed his medical records and has seen and discussed the video, which demonstrated that Mr. Nellson needed a wheelchair/walker.

83.

While in the USP Big Sandy SHU from May to August 2016, Mr. Nellson could not clean himself, move around, or feed himself well. Mr. Nellson had to crawl around the floor, unable to properly tend to his needs.

84.

As a result of Defendants Norris, Rosario, and Arrington placing Mr. Nellson in the SHU without a wheelchair or a walker, Mr. Nellson developed suppurating calluses on his hands and knees from crawling around, suffering.

85.

As a result of Defendants Norris, Rosario, and Arrington placing Mr. Nellson in the SHU without a wheelchair or a walker, Mr. Nellson had to crawl around the floor, straining his back and worsening his spine injury.

86.

Defendants Norris, Rosario, and Arrington placed Mr. Nellson in deliberate indifference to his health and to punish him for his disability.

87.

By placing Mr. Nellson in the SHU without a means of ambulation, Defendants Norris, Rosario, and Arrington caused Mr. Nellson to suffer from extreme mental anguish, physical damage, and pain & suffering on Mr. Nellson.

88.

John Doe Warden of USP Big Sandy, KY, must review decisions to place prisoners in administrative segregation, also labeled the SHU.

89.

John Doe Warden of USP Big Sandy, KY, reviewed the placement of Mr. Nellson in 23:1 lockdown and therefore understood that Mr. Nellson was being placed in lockdown for "refusal to walk" when ordered to, despite not being able to.

90.

John Doe Warden of USP Big Sandy, KY, reviewed the findings and conclusions of his subordinates Lt. Norris as they relate to the "video" of Mr. Nellson supposedly working out, which confirmed Mr. Nellson could **not** walk. Yet, John Doe Warden kept Mr. Nellson in 23:1 lockdown despite having video evidence that Mr. Nellson could not walk.

**D.  BOP continues to misclassify Mr. Nellson as a Care Level 2 prisoner.**

91.

While at USP Big Sandy, BOP misclassified Mr. Nellson as a Care Level 2 prisoner. BOP misclassified Mr. Nellson based on: 1) Nurse Arrington's lies regarding what she saw on the alleged "video" of Mr. Nellson exercising in his cell; 2) Dr. Rosario's deliberate indifference regarding Mr. Nellson's symptoms and health; 3) PA-C Billiter's refusal to believe Mr. Nellson despite all evidence pointing to Mr. Nellson not being able to walk; and 4) Defendants Lefever and Mills falsely diagnosing Mr. Nellson as having "conversion disorder" and attributing his symptoms to a mental health disease rather than his very real spinal injury. Consequently, all the named Defendants in this paragraph caused said misclassification and resultant below-standard medical attention that comes with said classification.

**E. Mr. Nellson continues to file grievances in an attempt to seek redress of his mistreatment.**

92.

Throughout his stay at USP Big Sandy, Mr. Nellson filed grievances. Every grievance was eventually denied. For example, Mr. Nellson filed a grievance in June 2016 regarding the misstatements about him doing "jumping jacks" and "burpees" in the SHU, the lack of medical care, and his mistreatment at the hands of BOP staff. Ex. 11. On July 13, 2016, Mr. Nellson's grievance was denied. Ex. 12.

93.

On July 10, 2016 (mis-dated in the grievance) Mr. Nellson filed yet another grievance regarding accusations that he was lying, his placement in SHU, the lack of medical care he was receiving, and the fact BOP healthcare providers insisted it was all psychological. Ex. 13. Mr. Nellson filed yet another grievance on July 25, 2016. Ex. 14.

94.

In December 2016, Mr. Nellson was transferred to USP Hazelton.

**IV.   USP Hazelton, WV: Mr. Nellson continues to be denied medical care and is subjected to further horrendous treatment and conditions.**

95.

During his intake at USP Hazelton, it was noted by Hazelton medical personnel, on Mr. Nellson's Intake Screening Form, that he could not walk without a walker. Ex. 15. This became part of Mr. Nellson's medical records and was therefore accessible by every subsequent BOP healthcare provider of Mr. Nellson's at USP Hazelton.

**A.  Identities of the USP Hazelton Defendants.**

96.

Mr. Nellson brings claims against the following USP Hazelton Defendants: 1) Warden John Doe; 2) SHU Lt. John Doe; 3) Clinical Director Dr. Gregory Mims; and 4) PA-C Leigh Bir (the "USP Hazelton Defendants").

97.

Warden John Doe at USP Hazelton signed reviewed and approved the placement of Mr. Nellson in SHU without a means of ambulation, on two separation occasions, for six months. Warden John Doe at USP Hazelton, upon information and belief, read Mr. Nellson's records, including records indicating Mr. Nellson could not walk unassisted. Despite this, Warden John Doe approved Mr. Nellson being placed in SHU for 3 months at a time, twice, without a wheelchair or a walker. Warden John Doe's actions caused extreme mental anguish, pain and suffering, and physical damages to Mr. Nellson. While in Hazelton SHU Program, Nelson wrote grievances and complained about his mistreatment and need for ambulatory assistance, and upon information and belief, Warden John read and hear these grievances and complaint, yet nevertheless kept Mr. Nellson in the SHU Program.

98.

Clinical Director Dr. Gregory Mims at USP Hazelton signed off on PA-C Bird's negligence and deliberate indifference, as described in more detail below. John Doe Clinical Director, upon information and belief read all of Mr. Nellson's medical records, which included repeated findings that Mr. Nellson could not walk unassisted, was experiencing excruciating pain, and had been given at wheelchair at times. Despite knowing all this, John Doe Clinical Director approved the failure to prescribe pain medication, neurological medication, or muscle

relaxants to Mr. Nellson. John Doe Clinical Director also failed to direct that physical therapy be prescribed. John Doe Clinical Director's actions were negligent and demonstrated deliberate indifference to Mr. Nellson's health and safety.

99.

SHU Lt. John Doe at USP Hazelton approved the placement of Mr. Nellson in SHU without a wheelchair or a walker, failed to report Mr. Walker's inability to walk while in SHU, and failed to report the suppurating callouses that Mr. Nellson was experiencing. SHU Lt. John Doe knew of Mr. Nellson's condition, saw him in SHU, and yet showed deliberate indifference to his health and safety.

100.

Defendant PA-C Leigh Bird reviewed all of Mr. Nellson's medical records, which included repeated findings that Mr. Nellson could not walk unassisted, was experiencing excruciating pain, and had been given at wheelchair at times. Despite knowing all this,  PA-C Bird did not prescribe pain medication, neurological medication, or muscle relaxants to Mr. Nellson. Defendant Bird also failed to prescribe physical therapy. PA-C Bird's actions were negligence and demonstrated deliberate indifference to Mr. Nellson's health and safety.

**B. Mr. Nellson suffers a seizure as a result of his injuries and is, again, punished instead of helped.**

101.

As a result of all of the above, Mr. Nellson had his first ever seizure. It was a horrific and indescribable experience, only made worse by USP Hazelton staff.

102.

In December 2016, while at USP Hazelton, Mr. Nellson had a seizure while in his cell. The staff, thinking he was having an overdose, beat him while handcuffed and sent him to a

medical cell. The beating resulted in broken ribs. Ex. 16 (witness statement "A group of staff responded by entering the cell & hog tying Eddie. Wrist to ankles behind back and & strapping him (face down) on a hospital gurney. Staff continuously kept screaming at him about using drugs & overdosing. When Eddie came back out of medical the next day his face & body were covered in bruises & he had 3 broken ribs.").

103.

On his December 20, 2016 medical records, generated subsequent to the seizure, the reviewing nurse noted, "Inmate marginally able to ambulate with assist X2." Evidently, therefore, Mr. Nellson *could not walk* without assistance.

104.

On December 23, 2016, PA-C Leigh Bird reviewed all of Mr. Nellson's medical records, which included repeated findings that Mr. Nellson could not walk unassisted, was experiencing excruciating pain, and had been given at wheelchair at times. PA-C Bird put together a timeline of events regarding Mr. Nellson's health. Ex. 17. PA-C Bird, however, did not prescribe pain medication, neurological medication, or muscle relaxants to Mr. Nellson. *Id.* Defendant Bird also failed to prescribe physical therapy. PA-C Bird also refused to prescribe Mr. Nellson an assistive device for ambulation. PA-C Bird upon information and belief has the authority to prescribe each item set forth and discussed in this paragraph.

105.

PA-C Bird's failure to prescribe an assistive device for ambulation, while having the authority to do so, caused Mr. Nellson to experience numerous falls and resulting injuries. These falls and resulting injuries became part of Mr. Nellson's medical records.

106.

Dr. Gregory Mims reviewed, agreed with, and signed off on PA-C Bird's course of action and conclusions. Dr. Mims had reviewed all of Mr. Nellson's records as well as the observation that Mr. Nellson **could not walk**, had suffered at least a head injury, and was in excruciating pain. Dr. Mims' acts and omissions, in light of his knowledge, showed deliberate indifference and negligence towards Mr. Nellson.

107.

Four months after the seizure, BOP gave Mr. Nellson an EEG that **confirmed he is epileptic**. **Mr. Nellson did not have a history of epilepsy before falling from his bunk**.

**C.  Mr. Nellson continues to files grievances, which BOP summarily denies.**

108.

On January 19, 2017, while as USP Hazelton, Mr. Nellson filed a Request for Administrative Remedy. He reported the fact that he was placed in SHU for no reason, while in a fragile medical state. Ex. 18. Mr. Nellson filed another Request for Administrative Remedy regarding the denial and delay of medical care he had been subjected to. Ex. 19. His requests for Administrative Remedies were denied.

109.

In April 2017, Mr. Nellson filed yet another grievance with BOP regarding his lack of medical care. Ex. 20. He specifically noted lies that had been spread by Nurse Arrington regarding his ability to ambulate. *Id*. Mr. Nellson's grievance was denied.

**D.  USP Hazelton Defendants place Mr. Nellson in solitary confinement, a first time, for a period of three months, without a wheelchair, leaving him to crawl around on the ground.**

110.

In May 2017, Mr. Nellson was placed in the SHU for three months, without a walker or a wheelchair.

111.

PA-C Bird observed the fact Mr. Nellson could not walk unassisted and personally relayed this to Dr. Mims. Defendants Warden John Doe of USP Hazelton, SHU Lt. John Doe, Clinical Director Dr. Mims, and PA-C Bird knew Mr. Nellson could not walk and approved the decision to place him in 23:1 lockdown without a wheelchair or a walker. USP Hazelton Defendants saw Mr. Nellson's records that he could not walk unassisted. Despite this, USP Hazelton Defendants placed Mr. Nellson in the SHU, without a wheelchair or walker.

112.

During his three months in the SHU, Mr. Nellson was back to crawling on the floor, unable to ambulate or take care of himself, forced to stretch and contort his back in order to move around.

113.

During his three months in the SHU, Mr. Nellson developed sores on his knees that bled and leaked puss because he was forced to crawl on the ground.

114.

During his three months in the SHU, Mr. Nellson had to strain his back by moving around the floor.

115.

Because USP Hazelton Defendants placed Mr. Nellson in the SHU, without a walker or wheelchair, Mr. Nellson suffered mental anguish, pain and suffering, and aggravation of his injuries.

**E.  Mr. Nellson continues to file grievances against BOP staff, including Defendants.**

116.

Mr. Nellson kept filing grievances against BOP for its denial of medical care. Ex. 21 (Apr. 6, 2017 Grievance). The grievance specifically addresses the misrepresentations by Lt. Norris, CO Arnet, A.W. McConnell, and Lt. Armes, as well as Nurse Arrington, regarding what they allegedly saw on the "tape" of him ambulating. *Id.* Mr. Nellson wrote, "this 'video' lie persists and is blocking medical care." *Id. See also* Ex. 22 (additional grievance on the same topic). Mr. Nellson had to re-file at least one grievance to comply with procedure. Ultimately, his grievances were all denied.

117.

In August 2017, Mr. Nellson was taken back to his cell, dragged by BOP staff.

118.

In August 2017, Mr. Nellson wrote to medical explaining that since his release from SHU all his "gains" had been lost and his medical issues had become worse. Ex. 23. He added, "I am in PAIN." *Id.* He also noted he had become weaker, his balance was worse, and all his symptoms had become worse. *Id.* He asked for medical treatment. *Id.* Upon information and belief, these communications became part of Mr. Nellson's medical history and were reviewed by all subsequent healthcare providers.

119.

On August 13, 2017, Mr. Nellson filed a Tort Claim Notice related to the denial and

delay of medical care he was experiencing. Ex. 24.

**F.  Mr. Nellson is placed in the SHU at USP Hazelton a second time, for another <u>three</u>**
**<u>months</u>, without a wheelchair or a walker.**

120.

In September 2017, USP Hazelton Defendants placed Mr. Nellson was 23:1 lockdown

(the SHU), again **<u>without a walker or a wheelchair</u>**, **<u>for another three months</u>**.

121.

Again, this decision was directed, approved, and implemented by USP Hazelton

Defendants.

122.

This decision was made despite the medical records that were reviewed by USP Hazelton

Defendants regarding Mr. Nellson's pain, injury, and inability to stand unassisted.

**G.  Mr. Nellson is finally seen by an outside physician, Dr. Duru, who confirms that:**
**Mr. Nellson cannot walk, Mr. Nellson needs pain medication, Mr. Nellson needs**
**physical therapy, and Mr. Nellson needs a spine MRI.**

123.

In October 2017, Mr. Nellson was taken to West Virginia University to see a neurologist.

Ex. 25. Mr. Nellson was seen by Dr. Uzoma Bruno Duru. *Id*.

124.

Dr. Duru noted that Mr. Nellson's Chief Complaints were:

- Seizures
- Balance Problems
- Headache
- Involuntary Movements
- Memory Problems

- Muscle Spasm
- Speech Disturbance
- Lack of Concentration
- Jaw Pain

Ex. 25 at 1.

125.

Dr. Duru, under "Gait," noted: "unable to stand on his own, needs assistance or walker to attempt to ambulate." Ex. 25 at 4.

126.

Dr. Duru stated Mr. Nellson needed an MRI Brain with and without contrast to explain the seizures. *Id*. at 5.

127.

Dr. Duru recommended that Mr. Nellson begin receiving Keppra 1000 mg BID. *Id*.

128.

Dr. Duru recommended that, <u>because of Mr. Nellson's inability to walk</u>, **he received a spine MRI in addition to the brain MRI.** *Id*.

129.

Dr. Duru also recommended Mr. Nellson receive physical therapy following the MRIs. *Id*.

**H.  Defendants Dr. Mims and PA-C Bird implement *none* of Dr. Duru's recommendations.**

130.

Dr. Duru's report and recommendations became a part of Mr. Nellson's medical records and were thereafter reviewed by Dr. Mims and PA-C Bird.

131.

Dr. Mims and PA-C Bird did not provide Mr. Nellson with physical therapy, as ordered by Dr. Duru.

132.

Dr. Mims and PA-C Bird did not provide Mr. Nellson with a wheelchair or walker, as ordered by Dr. Duru.

133.

Dr. Mims and PA-C Bird did not coordinate for Mr. Nellson to get a spine MRI, as ordered by Dr. Duru.

134.

Within a few weeks of the visit, Mr. Nellson was transferred to USP Canaan, PA.

**III.    USP Canaan, PA: Mr. Nellson finally began getting some of the treatment he is entitled but otherwise continues to suffer of constitutional deprivations.**

135.

During his in-processing, medical at USP Canaan, PA, flagged Mr. Nellson for a follow up.

136.

While at USP Canaan, Mr. Nellson finished his grievance process and began a new one for lack of medical care. *See* Ex. 26 (Collection of grievances and denials in 2018). Specifically, on January 9, 2018, Mr. Nellson reported the lack of medical care including both delay and denial of care. *Id.* at 8.  He specifically noted there was diagnosed or suspect brain and/or spinal damage. *Id.* He stated that the delay and denial of care resulted in permanent pain and medica issues. *Id.* Mr. Nellson's grievance was again denied.

**A.  Identities of the USP Canaan Defendants.**

137.

Mr. Nellson brings claims against the following USP Canaan Defendants: 1) Clinical Director Dr. Diane Sommer, 2) Dr. Philip Hlavac, and 3) PA-C Walters.

138.

Clinical Director Diane Sommer oversaw, reviewed, and approved the acts and omissions of Dr. Hlavac and PA-C H. Watlers. Further, Dr. Sommer saw Mr. Nellson and continued to deny him care based on her unsupported and subjective belief that Mr. Nellson was lying about his inability to walk.

139.

Dr. Philip Hlavac reviewed Mr. Nellson's records which, as discussed below, reflected pain, inability to walk unassisted, and at least a head injury. Dr. Hlavac continued the Defendants' constitutional violations against Mr. Nellson by delaying and denying medical care.

140.

PA-C H. Walters reviewed Mr. Nellson's records, which as discussed below, reflected pain, inability to walk unassisted, and at least a head injury. Despite this knowledge, PA-C Walters refused Mr. Nellson a walker.

**B.  USP Canaan healthcare providers continue to treat Mr. Nellson as a liar and deny him medical care on that basis, ignoring his ever-growing medical records.**

141.

On February 12, 2018, Mr. Nellson saw Dr. Diane Sommer, MD, CD. Ex. 27. Dr. Sommer reviewed Mr. Nellson's medical records and history, as summarized above.

142.

Dr. Sommer stated that Mr. Nellson "claimed" to have fallen but "no falls have been reported." *Id.* This was incorrect based on well-documented fall and dislocation of his shoulder. Dr. Sommer also stated that "previous MRI's were normal and he has seen one neurologist with a normal exam." *Id.* Dr. Sommer ignored the pages and pages of records pointing to untreated neurological issues. Again, Mr. Nellson was ignored and painted as a liar.

143.

It is undisputable that by this point. Mr. Nellson's medical records reflected that multiple healthcare providers, including both BOP providers and outside provider Dr. Duru, found Mr. Nellson could not walk unassisted.

144.

It is undisputable that by this point, Mr. Nellson's medical records reflected that an outside physician, Dr. Duru, had ordered a spinal MRI.

145.

It is undisputable that by this point, Mr. Nellson's medical records reflected that Mr. Nellson's gait could not be explained by a head CT because it had come back normal.

146.

It is undisputable that by this point, Mr. Nellson's medical records reflected he should have been taking pain medication for his headache.

147.

It is undisputable that by this point, Mr. Nellson's medical records reflected that Mr. Nellson should have begun receiving Keppra.

148.

It is undisputable that by this point, Mr. Nellson's medical records contained Dr. Duru's recommendation that Mr. Nellson begin receiving physical therapy.

149.

While at USP Canaan, Mr. Nellson finally began receiving physical therapy. Had Mr. Nellson received physical therapy sooner, he could have avoided degeneration, pain, and injuries.

150.

On February 16, 2018, PA-C H. Walters saw Mr. Nellson at the door of the housing unit. Ex. 28. Based on his notes from that visit, PA-C Walters had reviewed Mr. Nellson's medical history.

151.

PA-C Walters noted, "History of seizure disorder, and **<u>self-reported</u>** injury to spinal cord/back that causes him to have difficulty walking and he uses a walker." Ex. 28. Mr. Walters, therefore, was ignoring the medical records described above indicating that Mr. Nellson did in fact have an injury and did in fact have difficulty walking without assistance.

152.

During the visit, Mr. Nellson reported pain of 7 out of 10, specifically pain resulting from a shoulder injury sustained during a fall. Ex. 28. The fall was due to Mr. Nellson's untreated difficulty ambulating and Defendants' insistence on not providing him with an assistive device.

153.

PA-C Walters **did not** prescribe pain medication to Mr. Nellson. PA-C Walters denial of pain medication was negligent and showed deliberate indifference.

154.

Further, during this interaction, Mr. Nellson requested a push walker but instead PA-C Walters referred him to physical therapy for evaluation and treatment. Ex. 28. Therefore, PA Walters doubled down on refusing Mr. Nellson adequate ambulatory assistive devices.

155.

PA-C Walters' denial of Mr. Nellson's request for a push walker, especially during a visit during which PA Walters noted that Mr. Nellson had fallen due to inadequate ambulation assistive devices showed deliberate indifference and negligence.

156.

On March 8, 2018, Mr. Nellson filed two more grievances. He specifically stated that he had yet to see a neurologist, that he remained undiagnosed, and that he only began seeing a therapist two years after his injury. Ex. 29 and 30. As discussed below, both grievances were eventually denied. Exs. 31 and 32.

**C. Mr. Nellson is <u>finally</u> given a spine MRI and he *does*, in fact, have a severe back injury, which Mr. Nellson had suspected for two years and Defendants denied the entire time.**

157.

On March 22, 2018, over two years after his injury, Mr. Nellson received an MRI of his spine. Ex. 2. The MRI showed significant damage to his spine. *Id.* Specifically, the MRI of the spine showed the following:

- C4-C5: A 2-3 mm central disk extrusion extending 9 mm superiorly and inferiorly from the intervertebral disk space with mild cord compression;

- C5-C6: A 2-3 mm central/left paracentral disk herniation/osteophyte complex with mild compression of the anterolateral spinal cord resulting in moderate left neural

foraminal stenosis. Mild right neural foraminal stenosis due to osteophyte/disk complex. Mild superimposed broad based disk bulge. Mild loss of disk height; and

- C6-C7: A 2 mm central disk herniation with mild effacement of ventral sac.

Ex. 2.

158.

Upon receiving this MRI, Mr. Nellson discovered the injury that he could never medically confirm because of Defendants' conduct. He discovered that their lack of care had only allowed his injury to progress and that he had, in fact, injured his spine in March 2016. He discovered that his various symptoms, which Defendants had not treated, were attributable to his spinal injury, which they had all refused to diagnose. Mr. Nellson later discovered that this injury, which had been allowed to degenerate and progress, is now life-threatening. The progression and degeneration was caused by Defendants and was only discovered in March 2018.

159.

On April 11, 2018, BOP denied Mr. Nellson's appeal of the denial of yet another grievance by Mr. Nellson for lack of medical care, failure to provide him with a neurology consultation, and falsification of his records. Ex. 31 (denying Mr. Nellson's appeal).

160.

On April 23, 2018, BOP denied Mr. Nellson's appeal of the denial of yet another grievance by Mr. Nellson for lack of medical care, specifically the fact that Mr. Nellson was kept "locked up" without walker or wheelchair. Ex. 32 (denying Mr. Nellson's appeal).

161.

On May 15, 2018, Mr. Nellson had a neuro consult with Dr. Philip Hlavac regarding his March 22, 2018, MRI results. Dr. Hlavac reviewed the MRI results as well as Mr. Nellson's previous medical records. Despite the damage reflected in the MRI and Mr. Nellson's ongoing and neurological symptoms, Dr. Hlavac **failed to connect the MRI results to Mr. Nellson's symptoms**.

162.

As a result, after reviewing all of Mr. Nellson's records, Dr. Hlavac did not address the noted injuries to C4-C7. Therefore, Dr. Hlavac was negligent in his treatment and care of Mr. Nellson.

163.

Dr. Hlavac also failed to prescribe pain medication for Mr. Nellson, even though his spinal injury had now been confirmed.

164.

In May 2018, Mr. Nellson grieved that he was not receiving medical care at the appropriate standard, requested a transfer to an FMC, and asked that staff be disciplined. Ex. 33.

165.

In June 2018, BOP denied Mr. Nellson's grievance. Ex. 34. Specifically, the BOP found there was "insufficient diagnostic data to make a clinical determination for a transfer to a FMC at this time." *Id.*

166.

Contrary to BOP's position, USP Canaan did ask for a medical transfer and for either surgery or a surgical consult. Both were denied by BOP.

IV.    **Multiple Locations: Mr. Nellson was transferred to numerous different locations where he received little to no medical care, despite repeated requests and a diagnosed need for such care.**

167.

From June 2018 through May 2019, Mr. Nellson was shuttled through various federal facilities, including some located in Oklahoma, Florida, back to Oklahoma, Florida again, and California.

168.

Upon information and belief, Dr. Petry—at the Oklahoma Transfer Center—interfered every time Mr. Nellson came into his care during his transfers.

169.

During his first stay in Oklahoma Mr. Nellson was given pain medication, Tylenol 3, for the first time. This was the first time he received pain medication despite experiencing and reporting pain since March 2016.

170.

Starting in November 2017, and certainly by October 2018, BOP's records reflect that Mr. Nellson had Parkinson disease, that he was unable to ambulate 10 feet without a walker, and that he had recently fallen dislocating his shoulder. This latest injury, among others, was a result of the denial and delay of medical care described above.

I.    **FCC Victorville: Further confirmation of Mr. Nellson's reported symptoms and his suspected injuries, which Defendants ignored and denied for years.**

171.

Mr. Nellson arrived at FCC Victorville on November 29, 2018. While in FCC Victorville, CA, Mr. Nellson was immediately medically evaluated. He was told that he should

be a Care Level 4, maybe a Care Level 3. At that time, Mr. Nellson had been a Level 2 for years. Mr. Nellson also received pain medication.

172.

Dr. Peikard, the <u>Clinical Director at FCC Victorville</u> and a <u>neurologist</u> which Mr. Nellson saw while in FCC Victorville told Mr. Nellson that he is going to be paralyzed or dead in less than two years.

173.

In December 2018, FCC Victorville asked for Mr. Nellson to be re-classified to a Care Level 3 care. Ex. 35 at Nellson_00012.

174.

FCC Victorville's request to re-classify Mr. Nellson to a Care Level 3 prisoner listed the following narrative summary: 1) Progressive myelopathy; 2) Compromised ADL's; 3) Epilepsy; 4) Parkinson's; 5) Chronic Pain Management; 6) Recommendation of relieving pressure of the spinal cord thru surgery; and 7) Non ambulatory-w/c bound. Ex. 36 at Nellson_000014. In the transfer request, FCC Victorville stated, "If untreated, the pressure on his spinal cord can lead to significant and permanent nerve damage including paralysis and death." *Id.* at Nellson_000012. The request would have required a facility transfer. *Id.* BOP denied both requests.

175.

At FCC Victorville, Mr. Nellson was re-classified as a Care Level 3.

176.

Further, FCC Victorville applied for Mr. Nellson to become a Care Level 4. Defendant Petry ignored the classification and the request when he saw Mr. Nellson during transfers.

177.

On December 4, 2018, FNP-C Nancy Bogdanovic at FCC Victorville reported that Mr.
Nellson's condition was deteriorating in that he had become wheelchair bound in the past six
months. Ex. 36 at 5. Specifically, she wrote: "Loss of balance, coordination, and decline from
ambulation to w/c bound in the past 6 months. Able to stand only for a minute while leaning on
the wall or holding on to the armchair rest to support balance but is currently unable to stand
erect." *Id.* at 5. This report became a part of Mr. Nellson's medical records and indicates the
continuing damage he was experiencing as a result of Defendants' acts and omissions. Dr.
Peikard, as Clinical Director, signed off on these conclusions.

178.

On December 21, 2018, Mr. Nellson visited with FNP-C Bogdanovic and she reported
"Chronic neuropathic pain on the right side: R neck, R UE and RLE." Ex. 37 at 1. The records
also indicated that Mr. Nellson reported "Chronic muscle spasm," "Involuntary muscle
movements," and "Locks into position after involuntary muscle movement up to 20 minutes at a
time **causing relentless, excruciating pain, which is resolved by a muscle relaxant."** *Id.* at 1
(emphasis added). These notes became a part of Mr. Nellson's medical records and were, or
could have, been reviewed by every healthcare professionals to treat Mr. Nellson after this date.

179.

On March 19, 2019, FNP-C Bogdanovic saw Mr. Nellson and noted, "Pt. has been seen
multiple times in the clinic for the same reasons. Chronic pain d/t: Cervical stenosis, herniated
disc from C5-C7, Poly Neuropathy RUE and RLE." Ex. 38. During the same encounter Ms.
Bogdanovic noted, "MRI reveals extensive abnormal results from C4-C7 with stenosis of spinal

cord, herniated disc and osteophytes causing chronic pain in the upper, mid and lower back that has been appropriately managed while on the gabapentin trial earlier this year." *Id.*

180.

On April 3, 2019, FNP-C Bogdanovic again saw Mr. Nellson. Ex. 38. FNP-C Bogdanovic noted that the spine MRI "reveals extensive abnormal results from C4-C7 with stenosis of the spinal cord and herniated disc and osteophytes causing chronic pain in the upper, mid, and lower back that has been properly managed." Ex. 39 at 3.

181.

This appropriate diagnosis should lay to rest any previous denials, misrepresentations, confabulations, and fabrications by the various individual Defendants who sought to deny the real, painful, debilitating, and life-threatening injuries Mr. Nellson suffered in March 2016. They also repeatedly reiterate the damage Mr. Nellson suffered as a result of Defendants' tortious acts and omissions towards Mr. Nellson.

182.

Had Mr. Nellson received pain medication sooner, he would have avoided years of suffering.

183.

Had Mr. Nellson received a spine MRI sooner, the correct diagnosis would have been reached sooner.

184.

Had Mr. Nellson not encountered Defendants hell bent on hurting him, he would have had access to appropriate ambulation assistance, physical therapy, and pain management.

185.

Mr. Nellson had access to none of the care described above for years because of

individual Defendants' deliberate indifference to his suffering and/or medical malpractice which

had serious and permanent detrimental effects on his health.

V.    **USP Florence, CO**: **Mr. Nellson arrives at a Care Level 2 facility, despite being a
      Care Level 3 and then Care Level 4 prisoner.**

186.

In May 2019 Mr. Nellson was transferred to USP Florence, CO. While at USP Florence,

Mr. Nellson continued to ask to be re-classified to a Care Level 4. In fact, two days before

arriving at USP Florence, Mr. Nellson had been classified as a Care Level 3 prisoner but was

sent to USP Florence, which is a Care Level 2 facility.

187.

On May 10, 2019, Mr. Nellson wrote to Dr. Petry, who was at the Oklahoma City

Transfer Center. Mr. Nellson reported that Dr. Petry had accused him of malingering, that Mr.

Nellson was as sick as he "wanted to be," and to quit faking. Dr. Petry also accused Mr. Nellson

of faking his right-side weakness and need for diapers. Dr. Petry then told Mr. Nellson that if Mr.

Nellson kept asking for care, he would end up in SHU. Because of Dr. Petry's acts and

omissions, Mr. Nellson was again transferred to a facility inappropriate for his Care Level.

188.

Upon information and belief, Dr. Petry reviewed Mr. Nellson's medical records and

imaging, which made it clear Mr. Nellson was not malingering, that he had suffered an injury,

and that his condition was deteriorating due to Defendants' failure to treat him. Dr. Petry also

saw that other institutions, like FCC Victorville, had found Mr. Nellson to be a Care Level 3,

requiring Care Level 4, and with severely impaired mobility. Despite this, Dr. Petry showed

deliberate indifference and interfered with Mr. Nellson obtaining the care he needed by, for example, being transferred to an appropriate facility.

189.

Dr. Petry's insistence that Mr. Nellson was malingering, and continued delay of or failure to provide medical care, showed deliberate indifference to Mr. Nellson and resulted in substantial harm. Upon information and belief, Dr. Petry was instrumental in ensuring that Mr. Nellson's Care Level designations did not get respected when Mr. Nellson was transferred from one facility to the other.

190.

Mr. Nellson filed yet another grievance against BOP for failure to transfer. That grievance, too, was denied.

191.

In June 2019, Mr. Nellson was finally classified as a Care Level 4 prisoner. However, to date, Mr. Nellson remains at a Care Level 2 facility, which therefore does not provide Level 4 care. As a result, Mr. Nellson has no access to care that is adequate for his condition. This violates BOP policies which require transfer of prisoners classified to a different level of care.

192.

Mr. Nellson is not getting assistance with Activities of Daily Living or Activities of Daily Life. Mr. Nellson needs help with both.

193.

Mr. Nellson currently relies on his cell mates to change his diapers, help feed him, and shower him.

194.

Mr. Nellson cannot move around the facility with his wheelchair because many places are not accessible.

195.

Mr. Nellson had a very strong seizure that left him on the floor, without help, until he was able to kick his wheelchair to him. This degeneration of his condition, which now includes seizures, is a result of Defendants' delay and denial of medical care.

196.

Mr. Nellson's symptoms are getting worse and worse, and are lasting longer and longer, with ever increasing violence and duration of his seizures. This degeneration of his condition, which now includes seizures, is a result of Defendants' delay and denial of medical care.

197.

Mr. Nellson submitted yet another grievance on January 16, 2020. This has a three-day response time but BOP never responded. On February 17, 2020, Mr. Nellson notified Case Manager Coordinator Stone that having received no response, Mr. Nellson had exhausted his administrative remedies. Mr. Nellson received no response to his email.

198.

Every time Mr. Nellson was not held in a facility commensurate with his Care Level, Mr. Nellson was being held in a medically unsafe and medically dangerous condition. This began at the time of his injury and continues to this day.

## **CAUSES OF ACTION**

### **COUNT I**
### **BIVENS- VIOLATION OF EIGHTH AMENDMENT, INCLUDING CRUEL AND UNUSUAL PUNISHMENT AND FAILURE TO PROVE ADEQUATE MEDICAL TREATMENT**
*(Against all Defendants in their individual capacity)*

199.

Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 198 as if fully set forth herein.

200.

Based on the incorporated facts to support this count, the named Defendants violated Mr. Nellson's Eight Amendment Rights because they both knew and appreciated the harms posed to Mr. Nellson yet took no reasonable steps to mitigate those harms. Consequently, Mr. Nellson suffered extreme pain and suffering. Notably, USP Big Sandy and Hazelton Defendants, based on the incorporated facts to support this Count, engaged in cruel and unusual punishment by approving Mr. Nellson's placement in the SHU Program. Moreover, and again based on the facts incorporated to support this Count, these Defendants cruelly and unusually punished Mr. Nellson by refusing to provide him with a wheelchair or walker, or any ambulatory-assistant device, in a manner that prevented his from suffering excruciating pain. Based on Defendants' conduct, Mr. Nellson is entitled to all damages permitted by law, including special damages in the amount equal to any monies he had to pay for treatment of his various illnesses discussed throughout this Complaint, punitive damages, and attorneys fees.

## COUNT II
### *BIVENS* CLAIM: SUPERVISORY CAPACITY
*(Against Clinical Director Petry, Clinical Director Sommer, Clinical Director Mims, Clinical Director Rosario, John Doe Warden of USP Big Sandy, SHU Lt. Norris, John Doe Warden at USP Hazelton, and SHU Lt. John Doe at USP Hazelton, in their individual capacity)*

201.

Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 198 as if fully set forth herein.

202.

A *Bivens* cause of action is a judicially created counterpart to 42 U.S.C. § 1983 for claims against federal officers.

203.

The defendants identified above: Clinical Director Petry, Clinical Director Sommer, Clinical Director Mims, Clinical Director Rosario, John Doe Warden of USP Big Sandy, SHU Lt. Norris, John Doe Warden at USP Hazelton, and SHU Lt. John Doe at USP Hazelton are "Supervisory Defendants."

204.

Based on the facts incorporated to support this Count, Defendants Petry, Sommer, Rosario, and Mims were healthcare supervisory officials who condoned and ratified the conduct of Defendants identified above and engaged in denial and delay of medical care in their individual capacities. To this extend these Defendants personally participated in the decision accounted for in this Complaint, based on the facts incorporated to support this Count. Based on Defendants' conduct, Mr. Nellson is entitled to all damages permitted by law, including special damages in the amount equal to any monies he had to pay for treatment of his various illnesses discussed throughout this Complaint, punitive damages, and attorneys fees.

## COUNT III
## MEDICAL MALPRACTICE – NEGLIGENCE
*(Against Clinical Director Diane Sommer and PA-C Walters)*

### 205.

Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 198 as if fully set forth herein.

### 206.

Defendants Sommer and Walters are healthcare professionals employed by BOP at all relevant times. Defendant Sommer was not only a direct provider to Mr. Nellson but also acted in a supervisory capacity, approving PA-C Walters' acts and omissions. PA-C Walters was a medical provider to Mr. Nellson. Therefore, Defendants Sommer and Walters had a duty of care to Mr. Nellson.

### 207.

Defendants Sommer's and Walters' acts and omissions fell under their respective applicable standards of care. By doing so, Defendants Sommer and Walters breached their respective duties to Mr. Nellson.

### 208.

Defendants Sommer's and Walters' breaches were the actual and legal causes of Mr. Nellson's injuries.

### 209.

Defendants Sommer's and Walters' breaches resulted in damages to Mr. Nellson.

### 210.

Mr. Nellson discovered the extent of the injuries partially caused by Defendant Sommer's and Walters' negligence on March 22, 2018.

**COUNT IV**
**MEDICAL MALPRACTICE – GROSS NEGLIGENCE**
*(Against Clinical Director Diane Sommer and PA-C Walters)*

211.

Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 198 as if fully set forth herein.

212.

Defendants Sommer and Walters are healthcare professionals employed by BOP at all relevant times. Defendant Sommer was not only a direct provider to Mr. Nellson but also acted in a supervisory capacity to PA-C Walters' acts and omissions. PA-C Walters was a medical provider to Mr. Nellson. Therefore, Defendants Sommer and Walters had a duty of care to Mr. Nellson.

213.

Defendant Sommer's and PA-C Walters' omissions fell under their respective applicable standards of care. By doing so, Defendants Sommer breached their respective duties to Mr. Nellson.

214.

Defendants Sommer's and Walters' actions were grossly negligent.

215.

Defendants Sommer's and Walters' breaches were the actual and legal causes of Mr. Nellson's injuries.

216.

Defendants Sommer's and Walters' breaches resulted in damages to Mr. Nellson.

217.

Mr. Nellson discovered the extent of the injuries caused in part by Defendant Sommer's

and Walters' negligence on March 22, 2018.

**COUNT V**
**MEDICAL MALPRACTICE – RECKLESSNESS**
*(Against Clinical Director Diane Sommer and PA-C Walters)*

218.

Plaintiff repeats and incorporates by reference each and every allegation contained in

paragraphs 1 through 198 as if fully set forth herein.

219.

Defendants Sommer and Walters are healthcare professionals employed by BOP at all

relevant times. Defendant Sommer was not only a direct provider to Mr. Nellson but also acted

in a supervisory capacity, approving PA-C Walters' acts and omissions.

220.

Defendants Sommer's and Walters' acts and omissions fell under their respective

applicable standards of care. By doing so, Defendants Sommer and Walters breached their

respective duties to Mr. Nellson.

221.

Defendants Sommer's and Walters' actions were reckless.

222.

Defendants Sommer's and Walters' breaches were the actual and legal causes of Mr.

Nellson's injuries.

223.

Defendants Sommer's and Walters' breaches resulted in damages to Mr. Nellson.

224.

Mr. Nellson discovered the extent of the injuries caused by Defendant Sommer's

negligence on March 22, 2018.

**COUNT IV**
**MEDICAL MALPRACTICE – NEGLIGENCE**
*(Against Gary Petry, MD)*

225.

Plaintiff repeats and incorporates by reference each and every allegation contained in

paragraphs 1 through 138 as if fully set forth herein.

226.

Defendant Petry is healthcare professional employed by BOP at all relevant times.

Defendant Petry was Mr. Nellson's treating physician and therefore, Defendant Petry had a duty

of care to Mr. Nellson.

227.

Defendant Petry's acts and omissions fell under his applicable standard of care. By doing

so, Defendant Petry breached his duties to Mr. Nellson.

228.

Defendant Petry's breaches were the actual and legal causes of Mr. Nellson's injuries.

229.

Defendant Petry's breaches resulted in damages to Mr. Nellson.

## COUNT VII
## MEDICAL MALPRACTICE – GROSS NEGLIGENCE
*(Against Gary Petry)*

230.

Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 138 as if fully set forth herein.

231.

Defendant Petry is healthcare professional employed by BOP at all relevant times. Defendant Petry was Mr. Nellson's treating physician and therefore, Defendant Petry had a duty of care to Mr. Nellson.

232.

Defendant Petry's acts and omissions fell under his applicable standard of care. By doing so, Defendant Petry breached his duties to Mr. Nellson.

233.

Defendant Petry demonstrated a willful indifference to Mr. Nellson's safety, thereby behaving with gross negligence.

234.

Defendant Petry's breaches were the actual and legal causes of Mr. Nellson's injuries.

235.

Defendant Petry's breaches resulted in damages to Mr. Nellson.

## COUNT VIII
## MEDICAL MALPRACTICE – NEGLIGENCE
*(Against Clinical Director Gregory Mims and PA-C Leigh Bird)*

236.

Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 198 as if fully set forth herein.

237.

Defendants Mims and Bird were healthcare professionals employed by BOP at all relevant times.

238.

Defendant Bird was Mr. Nellson's treating healthcare professional and therefore, Defendant Bird had a duty of care to Mr. Nellson.

239.

Defendant Mims had supervisory and signoff authority over Defendant Bird. Defendant Mims had a duty of care to Mr. Nellson.

240.

Defendant Mims and Bird breached their respective duties to Mr. Nellson.

241.

Defendant Mims' and Bird's breaches were the actual and legal causes of Mr. Nellson's injuries.

242.

Defendant Mims' and Bird's breaches resulted in damages to Mr. Nellson.

## COUNT IX
## MEDICAL MALPRACTICE – GROSS NEGLIGENCE
*(Against Dr. Gregory Mims and PA-C Leigh Bird)*

### 243.

Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 198 as if fully set forth herein.

### 244.

Defendants Mims and Bird were healthcare professionals employed by BOP at all relevant times.

### 245.

Defendant Bird was Mr. Nellson's treating physician and therefore, Defendant Bird had a duty of care to Mr. Nellson.

### 246.

Defendant Mims had supervisory and signoff authority over Defendant Bird, who is a PA-C. Defendant Mims had a duty of care to Mr. Nellson.

### 247.

Defendants Mims and Bird breached their respective duties to Mr. Nellson.

### 248.

Defendants Mims and Bird committed gross negligence towards Mr. Nellson.

### 249.

Defendants Mims' and Bird's breaches were the actual and legal causes of Mr. Nellson's injuries.

### 250.

Defendant Mims' and Bird's breaches resulted in damages to Mr. Nellson.

## COUNT X
## MEDICAL MALPRACTICE – WILLFUL AND WANTON
*(Against Gregory Mims and PA-C Leigh Bird)*

251.

Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 198 as if fully set forth herein.

252.

Defendants Gregory Mims and Bird were healthcare professionals employed by BOP at all relevant times.

253.

Defendant Bird was Mr. Nellson's treating physician and therefore, Defendant Bird had a duty of care to Mr. Nellson.

254.

Defendant Mims had supervisory and signoff authority over Defendant Bird, who is a PA-C. Defendant Mims had a duty of care to Mr. Nellson.

255.

Defendants Mims and Bird breached their respective duties to Mr. Nellson.

256.

Defendants Mims' and Bird's acts and omissions evinced willful and wanton attitudes towards Mr. Nellson's health and safety.

257.

Defendants Mims' and Bird's breaches were the actual and legal causes of Mr. Nellson's injuries.

258.

Defendant Mims' and Bird's breaches resulted in damages to Mr. Nellson.

## COUNT XI
## INJUNCTIVE RELIEF
*(Against the BOP)*

259.

Plaintiff repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 198 as if fully set forth herein.

260.

Based on the facts to incorporate this Count, Mr. Nellson request injunctive relief in the form of immediately ordering the BOP to place in a level 4 facility, so that he can receive the required medical treatment and assistance to which his injuries entitle him. No amount of monetary recovery can compensate Mr. Nellson for the pain and suffering and damage caused each day that he is misclassified at a level lower than level 4. The denial of classifying him at the appropriate level, with correlated levels of medical care, is on going and not speculative, based on the facts incorporated to support this Count. Further, there is no penological justification for Mr. Nellson's mis-classification, and the interest of the public far outweigh the interest of the government in providing Mr. Nellson with adequate medical care at the correct level attuned to his injuries.

## **JURY REQUEST**

Mr. Nellson asks that his case be tried to a jury of his peers.

## **PRAYER FOR RELIEF**

Mr. Nellson respectfully asks that his Court find in his favor and award:

1)  Actual damages in an amount of no less than $ 100,000,000;

2)  Special damages;

3)  Attorney's fees and costs, as permitted by statute;

4)  Punitive damages;

5)  Injunctive relief ordering the Federal Bureau of Prisons to transfer Mr. Nellson to a Care

    Level 4 facility, or equivalent, and enjoin the Federal Bureau of Prisons from transferring

    back to a facility with a level care rating lower than the one assigned to Mr. Nellson.

Dated March 22, 2020.

_/s/John M. Shoreman_
John M. Shoreman (DC Bar No.: 407626)
McFadden & Shoreman, LLC
1050 Connecticut Avenue, NW, Suite 500
Washington, DC 20036
202-772-3188/202-204-8610 FAX
jmshoreman@verizon.net